**In re SPRING MEADOW TROUT HATCHERY, INC., Debtor.**

**In re Howard DIEHL, Jr. and Leslie J. Diehl, Individually and Jointly as Husband and Wife, Debtors.**

**Bankruptcy Nos. 81–00427, 81–00428.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 27, 1983.

Allan B. Goodman, Bethlehem, Pa., for debtors.

Karen L. Turner, Reading, Pa., for Stylianos Philippedes.

Edward McGee, Allentown, Pa., for Lower Milford Tp.

David J. Goldberg, Princeton, N.J., for Delaware River Basin Comn.

Karl E. Friend, Allentown, Pa., for trustee.

James G. Watt, Allentown, Pa., trustee.

## OPINION

THOMAS M. TWARDOWSKI, Bankruptcy Judge.

Presently before the Court are three claims upon the balance of a fund of money which is being held by the Delaware River Basin Commission (hereinafter "DRBC"), an agency of the United States government. This fund of money had been established and used to compensate neighboring landowners for damages caused to them by the debtors' excessive use of water in the operation of their trout hatchery business. The three claimants are the Township of Lower Milford, Pennsylvania, the DRBC,. and an individual named Stylianos Philippides. For the reasons hereinafter given, we shall rule in favor of Stylianos Philippides.[1]

We shall first summarize the rather complicated procedural and factual history of this matter.

The debtors filed voluntary petitions in bankruptcy under Chapter 11 of the Bankruptcy Code on February 6, 1981. Prior to said filings, however, the DRBC, in June, 1980, had brought an action against the Spring Meadow Trout Hatchery and against Howard A. Diehl, Jr. and Leslie J. Diehl in the United States District Court for the Eastern District of Pennsylvania. Mr. and Mrs. Diehl are the sole stockholders and officers of the Spring Meadow Trout Hatchery. The DRBC's action in District Court sought to enjoin the defendants from operating the trout hatchery and to require the defendants to file an application with the DRBC for permission to operate the trout hatchery. On July 2, 1980, District Judge Edward N. Cahn ordered, inter alia, that the trout hatchery limit its ground water withdrawals, that the defendants deposit $20,000.00 with the DRBC for use in compensating neighboring landowners for damages caused to them by the trout hatchery's excessive ground water withdrawals, and that the DRBC determine the damages suffered by neighboring landowners.

Shortly thereafter, and prior to their bankruptcy filings, the debtors deposited the $20,000.00 with the DRBC pursuant to Judge Cahn's Order, and the DRBC proceeded to retain a hearing officer and to conduct hearings regarding the damages suffered by neighboring landowners.

In addition to the aforementioned action in the United States District Court, Mr. and Mrs. Diehl were involved in a state court lawsuit regarding the trout hatchery with the Zoning Hearing Board of Lower Milford Township, which had also begun many months prior to the bankruptcy filings. In this lawsuit, the Court of Common Pleas of Lehigh County, Pennsylvania, on January 30, 1981, had upheld the Zoning Hearing Board's decision that the Township's zoning ordinance prohibited the operation of the

---

1. This Opinion constitutes the findings of fact and conclusions of law as required by Rule 752 of the Rules of Bankruptcy Procedure.

trout hatchery on the land on which it was being operated.[2]

On February 10, 1981, subsequent to the debtors' bankruptcy filings on February 6, 1981, and upon application of the debtors, we entered a Temporary Restraining Order which essentially enjoined the Township of Lower Milford and its agents from pursuing any state court legal proceedings against the debtors, including the enforcement or execution of any state court orders, until February 19, 1981, the date set for the hearing of the debtors' request for a Preliminary Injunction.

On February 18, 1981, District Judge Cahn, upon the recommendation of the DRBC, approved, in the interim, damage claims in the amount of $19,185.03. These claims were subsequently paid from the funds being held by the DRBC.

On February 19, 1981, after hearing, we entered a Preliminary Injunction, by which it was ordered: (1) that the terms of the aforementioned Temporary Restraining Order shall remain in effect until April 15, 1981; (2) that the debtors shall reduce the fish inventory of the trout hatchery by one-half of its present volume by March 13, 1981; (3) that the debtors shall deposit with the DRBC an additional $20,000.00, to be paid in two $10,000.00 installments, the first of which shall be paid by April 15, 1981, and the second of which shall be paid by May 15, 1981. The $20,000.00 was to be used for later determination and award to neighboring landowners for additional damages found to be caused by the debtors' continued operation of the trout hatchery; (4) that the debtors cease operation of the trout hatchery by April 15, 1981; and (5) that the debtors, by their counsel, shall file with the Court within one week the appropriate pleadings requesting priority treatment for "certain creditors of these estates, including neighboring property owners."

The debtors were unable to make the first $10,000.00 payment to the DRBC by

April 15, 1981. Therefore, the Township of Lower Milford requested of the Court that the debtors be held in contempt of our Order of February 19, 1981, and a hearing on this matter was held on April 21, 1981. At the hearing, Mr. Diehl admitted that the debtors had been unable to make the $10,000.00 payment by April 15, 1981. However, he produced a $10,000.00 money order, dated April 21, 1981, payable to him from Stylianos Philippedes. Mr. Diehl testified that Mr. Philippedes was an acquaintance of his whom he had met about a month ago through mutual friends. Mr. Diehl's testimony regarding Mr. Philippedes and the $10,000.00 was quite abbreviated and vague. However, it was clear from his testimony that the $10,000.00 from Mr. Philippedes was a loan and was related to the April 15, 1981 deadline.[3]

At the hearing of April 21, 1981, Mr. Diehl endorsed the $10,000.00 money order over to the DRBC, and the $10,000.00 was duly deposited with the DRBC. Also, the Township agreed to withdraw its contempt petition.

As a result of the fifth provision of our Order of February 19, 1981, *supra*, and following notice and hearing on the debtors' application pursuant thereto, the Court, on May 4, 1981, entered an Order which stated in relevant part:

"ORDERED that all monies paid by Debtors to the Delaware River Basin Commission for application by that Federal Agency toward payment of the damages suffered by landowners caused by Debtors' trout hatchery operation in Lower Milford Township pursuant to order of this Court be treated as a Bankruptcy Code § 503(b)(1)(A) administrative expense necessary for the preservation of the estates."

The debtors subsequently made the second $10,000.00 payment to the DRBC pursuant to our Order of February 19, 1981.

---

2. The Diehls' request for a stay of the Common Pleas Court's decision was denied by the Commonwealth Court of Pennsylvania on February 10, 1981.

3. The details of this transaction will be elaborated upon *infra* in the testimony of Mr. Philippedes in this Court on November 8, 1982.

Subsequently, additional damages of $10,086.93 were paid to neighboring landowners from the DRBC fund. In all, $40,000.00 was deposited with the DRBC and $29,271.96 was paid out in damages. As of December 3, 1981, there was a balance in the DRBC fund of $11,835.92 (including interest of $1,107.88), and there were no further damage claims to be paid.

On December 3, 1981, in order to terminate the aforementioned action in the United States District Court, Judge Cahn ordered, inter alia, (1) that the DRBC shall pay into the Bankruptcy Court the balance of $11,835.92 remaining in the DRBC fund; and (2) that the matter shall be marked closed on the District Court docket.

The Township of Lower Milford, on December 11, 1981, filed in our Court a Petition, by which it sought partial reimbursement from the DRBC fund for its costs in monitoring the effects of the debtors' trout hatchery operation upon neighboring ground water resources and wells from February 1, 1980 until June 1, 1981. The Township alleged monitoring costs in the total sum of $22,941.20. The Petition requested that the balance of $11,835.92 in the DRBC fund be paid to the Township as an administrative expense pursuant to Section 503(b)(1)(A) of the Bankruptcy Code, 11 U.S.C. § 503(b)(1)(A).

On February 19, 1982, the DRBC filed a Cross Petition, by which it sought reimbursement from the DRBC fund principally for its costs in retaining a hearing officer and conducting hearings on the damage claims of neighboring landowners of the debtors' trout hatchery. The DRBC's claim was for $5,409.16, and it alleged that it was entitled to this amount from the DRBC fund as a § 503(b)(1)(A) administrative expense.

On June 8, 1982, the debtors voluntarily converted both bankruptcy cases from Chapter 11 to Chapter 7.

Subsequently, we granted Mr. Philippedes leave to intervene in this matter and he requested that the entire balance in the DRBC fund be paid to him as repayment of principal and interest for his loan of $10,000.00 to Mr. and Mrs. Diehl. He sought this relief on the theory that the balance was not property of the estate and should be returned to its source or, alternatively, on the theory that he was entitled to the balance as a § 503(b)(1)(A) administrative expense.

At the hearing on November 8, 1982, Mr. Philippedes testified that a mutual friend of Mr. Philippedes and of Mr. and Mrs. Diehl had persuaded him to lend $10,000.00 to Mr. and Mrs. Diehl. He testified that he was given to understand that Mr. Diehl was involved in a court proceeding and that "if he didn't post the $10,000.00, the man was going to go in jail and his business was going to be auctioned off and that type of thing." (N.T., 11/8/82, p. 45). However, Mr. Philippedes did not know at that time that the Diehls were actually involved in a bankruptcy proceeding.

Mr. Philippedes further testified that the Diehls had agreed to repay him the $10,000.00 plus interest by May 15, 1981. In return for the aforementioned $10,000.00 money order, dated April 21, 1981, Mr. Philippedes received a demand note from Mr. and Mrs. Diehl for $10,000.00 plus 12% per annum interest.

The question of the disposition of the balance of the DRBC fund has been briefed by all parties in interest and is now ready for decision.

The threshold issue which we must address is whether or not the $10,000.00 which Mr. Philippedes loaned to the Diehls ever became property of the bankruptcy estates within the meaning of Section 541 of the Bankruptcy Code, 11 U.S.C. § 541. If this money is not property of the estates, it cannot be the subject of claims for administrative expenses pursuant to § 503(b)(1)(A) of the Code. See § 507 and § 726 of the Code.

The only possible way by which the $10,000.00 in question could have become property of the estates is by virtue of § 541(a)(7) of the Code, which states:

"(a) The commencement of a case under section 301, 302, or 303 of this title cre-

ates an estate. Such estate is comprised of all the following property, wherever located:

> (7) Any interest in property that the estate acquires after the commencement of the case."

The above-quoted provision is potentially applicable to the present matter because the $10,000.00 loan by Mr. Philippedes was made after the commencement of the bankruptcy cases. However, we conclude that the $10,000.00 did not become property of the bankruptcy estates because the estates did not acquire any interest in the $10,000.00.

The factual situation in the present matter is, in our view, analogous in significant respects to the factual situation in the case of *In re Veon, Inc.*, 12 B.R. 186 (Bkrtcy.W. D.Pa.1981). In *Veon*, two officers of Veon, Inc. each purchased, with their own personal funds, bearer bonds of a combined total of $200,000.00. They delivered these bonds to the Department of Environmental Resources of the Commonwealth of Pennsylvania on behalf of Veon, Inc. for the sole purpose of providing security for the application of Veon, Inc. for a state mining permit. Pursuant to the agreements between each officer and Veon, Inc., the bonds were to remain the sole property of the officers, subject only to the use of the bonds by Veon, Inc. as security with the Department of Environmental Resources. Shortly thereafter, Veon, Inc. filed bankruptcy under Chapter 11. Subsequently, the Department of Environmental Resources denied the mining permit to Veon, Inc. and released the bonds to the debtor's counsel pending the Court's determination as to whether the debtor's officers or the debtor's estate are entitled to them.

Upon the debtor's complaint seeking a determination as to the ownership of the bonds, the *Veon* Court held that the bonds must be returned to the two officers. The Court found that a bailment relationship existed between the officers as bailors, on the one hand, and the debtor as bailee, on the other hand.

The Court, at 12 B.R. 189, stated the definition of a bailment under Pennsylvania law:

> "A bailment is a 'delivery of personalty for some particular purpose, or upon mere deposit, upon a contract, express or implied, that after the purpose has been fulfilled it shall be redelivered to the person who delivered it, or otherwise dealt with according to his directions, or kept until he reclaims it...' *Wright v. Sterling Land Co.*, 157 Pa.Super. 625, 626, 43 A.2d 614, 615 (1945)."

In that a bailment relationship did exist in *Veon*, the Court further ruled that the title to the bonds did not become property of the debtor's estate, and, once the purpose for which the bonds were posted was fulfilled, they had to be returned to the bailor-officers.

Although a bailment relationship in the strictest sense does not exist in the present matter between Mr. Philippedes and the debtors, we believe that a relationship quite similar to the bailment relationship in *Veon* does exist between them. In the first place, the $10,000.00 which Mr. Philippedes loaned to the debtors was loaned to them for a particular purpose. Although Mr. Philippedes, a layman, did not know the precise purpose at the time, he did know that the debtors needed the money in connection with a court proceeding dealing with their trout hatchery business and that Mr. Diehl faced sanctions if the money was not forthcoming.

Secondly, as in *Veon*, the money was for a limited and contingent purpose. In our case, of course, the purpose was expressly limited to the compensation of the neighboring landowners. Also, the purpose was contingent in that, as eventually occurred, there was always the strong probability that there would be a balance remaining in the DRBC fund following the payment of all damage claims.

Thirdly, in *Veon*, the personalty was delivered to and held by a governmental agency. We believe that essentially the same type of transaction occurred in the present matter. We do not find it conclusive that

Mr. Philippedes' $10,000.00 money order was made payable to Mr. Diehl and not to the DRBC because, as stated *supra,* in our courtroom at the contempt hearing of April 21, 1981, Mr. Diehl endorsed the money order over to the DRBC on the same day he received it. The endorsed money order was then delivered directly to the DRBC, thus, in effect, bypassing the debtors' estates.

Finally, in both *Veon* and in the present matter, the debtors had no discretion as to the use of the personalty. This was obviously so in *Veon* in accordance with the contractual arrangements of the parties. In our case, Mr. Diehl certainly felt, and quite correctly, that he had no discretion as to the use of the money order. He had already missed the Court-imposed deadline of April 15, 1981 and was clearly threatened by punishment for contempt at the contempt hearing of April 21, 1981 had he not produced the $10,000.00. He was certainly under a legal duty to endorse the $10,000.00 money order directly over to the DRBC at that time.

In conclusion, we believe that the similarities between the factual situations in *Veon* and in the present matter are quite striking and far outweigh the differences. Also, in equity and fairness, we do not believe that any of the differences are conclusive as to our disposition of this matter. Therefore, we find that the relationship between Mr. Philippedes and the debtors is sufficiently similar to a bailment relationship so as to require, in equity and fairness, the same result as in a bailment relationship. Thus, we further find that Mr. Philippedes' $10,000.00 never became property of the debtors' estates and that, therefore, from the DRBC fund, Mr. Philippedes is entitled to the return of his $10,000.00 plus 12% per annum interest from April 21, 1981 to the present now that the purpose for which the DRBC fund was established has been fulfilled.

We are cognizant of the requirement that a bailor or similarly situated person must be able to identify or trace the perso-

nalty in question in order to recover it when it has been intermingled with property of the estate. See, e.g., *In re Wholesale Furniture Mart, Inc.,* 24 B.R. 240 (Bkrtcy.W.D. Mo.1982); *In re Independence Land Title Corp. of Illinois,* 18 B.R. 673 (Bkrtcy.N.D.Ill. 1982); and 4 Collier on Bankruptcy para. 541.08, p. 541–44 (1982). However, we have no difficulty in finding that this requirement has been satisfied in the present matter. Mr. Philippedes has sufficiently traced his $10,000.00 into the DRBC fund and it remains sufficiently identifiable therein. We have found no case law that would lead us to a contrary conclusion.

The only question before the Court at this time is the entitlement to the balance of the DRBC fund. The three claimants have made their claims only upon said fund. It appears that the fund may be exhausted by the payment to Mr. Philippedes based upon our decision today. If so, this matter can be closed.[4] If not, we shall have to make a determination as to the rights of the other claimants herein. Therefore, we shall direct the DRBC and the Trustee jointly to make a current written accounting to the Court of the status of the DRBC fund.

---

4. For this reason, in our recitation of the procedural and factual history of this matter, we did not thoroughly explain the possible grounds for

the § 503(b)(1)(A) administrative expense claims of the Township of Lower Milford and the DRBC.